VAN NORTWICK, J.
C.A.D. appeals a final order adjudicating him delinquent and committing him to a high-risk facility. C.A.D. argues that, in disregarding the recommendation of the Department of Juvenile Justice (DJJ) to commit him to a moderate risk residential facility, the trial court failed to comply with the requirements set forth in E.A.R. *674 v. State, 4 So.3d 614 (Fla.2009). We find that the order under review satisfies the requirements of E.A.R. and, accordingly, affirm.
Following C.A.D.’s guilty plea to violating probation, in its disposition report the DJJ recommended that C.A.D. be committed to a moderate risk residential placement. In making this recommendation, DJJ reported:
According to the PACT assessment, he is reported as a HIGH risk to re-offend. [C.A.D.] is not compliant with school; he attends school when necessary with has [sic] average grades and attendance. [C.A.D.] has received referrals or other disciplinarian [sic] actions while in school. [C.A.D.] is under the custody of the Family First Network. [C.A.D.] has not had any contact with his mother or father. [C.A.D.] does not participate with church structured activities or any extracurricular activities. According to [C.A.D.], he has been sexually abused and was made to smoke crack cocaine by the abuser. [C.A.D.] absconded from probation on 2 separate occasions (July and December 2008). [C.A.D.] tested positive for marijuana and cocaine on several occasions. The only lifestyle [C.A.D.] knows is drugs and has admitted to smoking marijuana daily and using powder cocaine every other day. Also, [C.A.D.] admits to selling drugs to provide rent, utilities, food and to support his habit. [C.A.D.] is socially mature for his age.
At this time, the Department of Juvenile Justice respectfully requests that youth, be committed to a Moderate Risk Program with Intensive Drug Rehabilitation.
At the disposition hearing, C.A.D. testified he had a “drug problem” for which he was not receiving help. After receiving evidence and argument of counsel; the trial court announced that it was departing from the DJJ recommendation because C.A.D., then seventeen, had a
history of failure to appear in court, history of not being available for his probation officer, and his most recent history of a two month, nearly two month absconsion from supervision at a time when both [the] Department of Juvenile Justice and the Department of Children and Family Services were trying to provide supervision. In fact, I believe he absconded from a foster care placement.... I have concerns that a moderate risk commitment program is going to provide adequate security to be sure that he doesn’t abscond while in commitment.... That’s why I[am] choosing high risk.
The trial court expressly considered matters, such as the length of the C.A.D.’s absence from foster care supervision and his failure to appear in court, which were not addressed in the DJJ’s disposition report. The trial court then explained that a high risk commitment was more appropriate given the heightened security provided in such a facility and given that “[C.A.D.] needs help with his drug problem and ... moderate risk commitment is unlikely to provide sufficient security to do that without [C.A.D.] disappearing....”
In E.A.R., the Florida Supreme Court “announced a new, more rigorous analysis in which a trial court must engage before departing from DJJ’s recommendation.” M.J.S. v. State, 6 So.3d 1268, 1269 (Fla. 1st DCA 2009). E.A.R. held that a trial court may not depart from the recommendation of DJJ merely because it disagrees with that recommendation; instead, the trial court must provide reasons that are supported by a preponderance of the evidence. 4 So.3d at 639. The Supreme Court explained the standards the trial *675 court must meet in providing reasons for a departure, as follows:
The only rational or logical means through which the juvenile court may provide reasons that explain, support, and justify why one restrictiveness level is more appropriate than another — and thereby rationalize a departure disposition — -is for the court to:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels including (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential lengths of stay associated with each level, and the divergent treatment programs and services available to the juvenile at these levels; and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile — in the least restrictive setting — and maintaining the ability of the State to protect the public from further acts of delinquency.
Simply listing reasons that are totally unconnected to this analysis does not explain why one restrictiveness level is better suited for providing the juvenile offender the most appropriate disposi-tional services in the least restrictive available setting.
* * *
We conclude that simply parroting is insufficient to justify departure and that, instead, the juvenile courts stated reasons, must provide a legally sufficient foundation for disregarding the DJJs professional assessment and the PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child’s programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public. These are suitable means of insuring fulfillment of the Legislatures comprehensive scheme and its stated intent that the juvenile courts of this state exercise appropriate discretion with the ultimate aim of providing the juvenile offender the most appropriate disposi-tional services in the least restrictive available setting.
Id. at 638 (italics in original).
Here, in departing from the DJJ’s recommendation, the trial court explained that a moderate risk facility would not be sufficiently secure to maintain a serial absconder, such as C.A.D., in the drug treatment program that C.A.D. requires. While it is true that DJJ did note in its report that C.A.D. skips school and that he has absconded from probation on two occasions, the report does not mention that he has a history of failing to appear in court or absconding from foster care for a significant period of time. In addition to the matters listed by DJJ in its report, the trial court found these facts significant in determining a need for a high risk commitment. Thus, the trial court was not simply “parroting,” to use E.A.R.’s term, the matters already considered by DJJ.
We acknowledge that the trial court did not discuss the lengths of stay possible in either moderate risk or high risk commitments, as E.A.R. suggests. Id. at 638. We do not find such an omission fatal, however, because DJJ did not make a recommendation as to the length of stay in its recommendation of moderate risk commitment. As we read the DJJ’s disposition report and the ruling of the trial court, the point of the commitment here is to provide C.A.D. with intensive drug rehabilitation. Under the statutory scheme, “[a]ny commitment of a delinquent child to the department [of Juvenile Justice] must be for an indeterminate period of time” and that the “duration of the child’s place *676 ment in a commitment program of any restrictiveness level shall be based on objective performance-based treatment planning.” § 985.455(3), Fla. Stat. (2008). Once a trial court has committed a juvenile to a specific restrictiveness level, it falls to DJJ to determine the most appropriate placement. § 985.441(l)(b). As a result, the length of stay in either placement would depend on the rehabilitation program(s) available to C.A.D. and on the success of his participation in such rehabilitation program.
Because the trial court here utilized the proper legal standard and because its stated reasons are supported by competent, substantial evidence in the record, we affirm.
AFFIRMED.
BARFIELD and KAHN, JJ., concur.