KAHN, J.
Appellant, T.M., challenges a revocation of juvenile probation, alleging the trial court erred by departing from the recommended disposition of the Department of Juvenile Justice (DJJ). We reverse.
On August 24, 2009, T.M. entered a plea of guilty to one count each of grand theft auto and resisting an officer without violence. The circuit court placed appellant on juvenile probation for a period of one year. On February 10, 2010, appellant pled guilty to violating the terms of his probation by testing positive for marijuana while enrolled in a substance abuse program. By order of the court, DJJ prepared a predisposition report (PDR), which recommended that T.M. be again sentenced to a term of probation subject to Department supervision.
At the March 25, 2010, disposition hearing, the State asked that appellant’s probation be revoked and that T.M. be placed in a moderate-risk setting. The trial judge stated his preference for moderate risk but inquired of the parties as to the availability of a low-risk program. This prompted the juvenile probation officer to identify a “step” program in Yulee, Florida, and another low-risk program also in Nassau County. Defense counsel objected, arguing that a low-risk facility was not the most appropriate service because it was not the least restrictive available setting.
After argument from both parties, the court revoked probation and adjudicated T.M. delinquent for a misdemeanor battery as well. Citing appellant’s heightening criminal conduct, the court overrode the PDR recommendation of continued probation and committed T.M. to the custody of DJJ in a low-risk residential program. Defense counsel preserved her objection.
By statute, a juvenile disposition hearing serves to determine “the most appropriate dispositional services in the least restrictive available setting provided for ... in delinquency cases.” See § 985.03(21), Fla. Stat. (2009). When a trial court adjudicates a child as having committed a delinquent act and determines that the child should be committed to DJJ, “[t]he court shall commit the child to the department at the restrictiveness level identified or may order placement at a different restrictiveness level.” See § 985.433(7)(b), Fla. Stat. (2009).
In E.A.R. v. State, 4 So.3d 614, 638 (Fla.2009), the supreme court “announced a new, more rigorous analysis in which a trial court must engage before departing from DJJ’s recommendation.” See M.J.S. v. State, 6 So.3d 1268, 1269 (Fla. 1st DCA 2009). The supreme court held “a trial court may not depart from the recommendation of DJJ merely because it disagrees with that recommendation; instead, the trial court must provide reasons that are supported by a preponderance of the evidence.” See C.A.D. v. State, 18 So.3d 672, 674 (Fla. 1st DCA 2009) (citing E.A.R., 4 So.3d at 639). E.A.R. then explained the *1009 standards the trial court must meet when providing reasons for a departure:
The only rational or logical means through which the juvenile court may provide “reasons” that explain, support, and justify why one restrictiveness level is more appropriate than another — and thereby rationalize a departure disposition — is for the court to:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels including (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential “lengths of stay” associated with each level, and the divergent treatment programs and services available to the juvenile at these levels; and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile — in the least restrictive setting — and maintaining the ability of the State to protect the public from further acts of delinquency.
See 4 So.3d at 688.
After thorough review of the record on appeal, we must conclude that the court failed to comply with these highly specific statutory requirements in two significant respects. First, we cannot discern that the court ever “[a]rticulate[d] an understanding of the respective characteristics of the opposing restrictiveness levels....” See id. After the State asked that T.M. be committed to a moderate-risk program, the court inquired of the probation officer whether any low-risk setting was available. The probation officer cited the availability of two different low-risk settings, the first of which he described as a “step” program in Yulee, Florida. The officer recommended that appellant be committed to this program, which the court characterized as a “wilderness” setting where appellant could “[g]et out on the river ... and reflect on things [amidst] nature.” Apparently satisfied with the features of the program, the court announced, “And [appellant’s] going to be committed to low-risk.”
Upon defense counsel’s objection, the court explained the reasoning behind its determination. To continue appellant on probation, the court reasoned, would “send[ ] the wrong signal to him that there are no sanctions for his conduct. And he needs to know that there are sanctions when he does not obey the law.” Though the court clearly articulated a reason in support of its ultimate determination, it did not expound upon such questions as “the type of child that each restrictiveness level is designed to serve, the potential ‘lengths of stay’ associated with each level, and the divergent treatment programs and services available to the juvenile at these levelsf.]” See id. As required by E.A.R., the court should have compared the relevant features of continued probation to those of low-risk commitment, with a focus on the appropriateness of each setting as a tool for achieving the rehabilitative goal. See id. (directing trial court wishing to impose a “departure disposition” to “explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile ... and ... protecting] the public from further acts of delinquency”).
Second, the record does not fairly reveal that the court identified any material information that DJJ might have misconceived or failed to notice. See id. (requiring juvenile court wishing to depart from DJJ’s professional assessment and PDR to identify “significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child’s programmatic, rehabilitative needs along with the risks that the unrehabilitat- *1010 ed child poses to the public”). “Simply regurgitating information provided by ... the DJJ’s comprehensive assessment and PDR does not establish acceptable statutory reasons as to why the court is ‘disregarding’ ... DJJ’s recommended disposition.” E.A.R., 4 So.3d at 638. “Rather, such parroting merely communicates that the court concurs with the DJJ’s assessment ... but then, for some unexplained, unarticulated ‘reason,’ has imposed a judicially recrafted disposition.” Id.
Neither the disposition hearing transcript nor the commitment order shows that the court, preoccupied to a large extent by appellant’s “escalating ... criminal conduct,” considered any factors beyond those raised in the PDR. The court observed that appellant had “[flouted] the law” and committed “multiple violations” while on probation. The record of past drug use, the court noted, made appellant a candidate for moderate-risk commitment. The PDR, however, accounts for all such conduct, yet reaches a different ultimate recommendation.
The court’s “brief explanation of its departure from the DJJ’s recommendation ... did not meet the legal standard enunciated in E.A.R.” See S.G. v. State, 26 So.3d 725, 726 (Fla. 2nd DCA 2010). Accordingly, the disposition must be REVERSED and the matter REMANDED to the trial court for further proceedings. See id.
VAN NORTWICK and THOMAS, JJ., concur.