74 So.3d 173 (2011)
B.L.R., A Child, Appellant,
v.
STATE of Florida, Appellee.
No. 1D10-6581.
District Court of Appeal of Florida, First District.
November 16, 2011.
*174 Nancy A. Daniels, Public Defender, and Archie F. Gardner, Jr., Assistant Public Defender, Tallahassee, for Appellant.
Pamela Jo Bondi, Attorney General, and Christine Ann Guard, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
Appellant, a juvenile, seeks review of a delinquency disposition order committing him to a maximum-risk facility. He contends that the trial court failed to comply with E.A.R v. State, 4 So.3d 614 (Fla.2009), in deviating from the recommendation of the Department of Juvenile Justice (DJJ) that he be committed to a high-risk facility. We agree and reverse.
While on post-commitment probation, Appellant was arrested for carrying a concealed firearm, possession of a weapon on school grounds, resisting an officer without *175 violence, and possession of a firearm by a convicted delinquent. Appellant was charged with violating his probation based on these offenses. Appellant admitted the violation and the trial court ordered a pre-disposition report (PDR). The PDR recounted Appellant's prior offenses and his commitment history, which included terms of probation and commitments to medium-risk and high-risk facilities. The PDR recommended that Appellant be committed to a high-risk facility based on the "seriousness" of his new offenses and his "lack of effort to abide by probation requirements."
At the disposition hearing, the State argued that the Appellant should be committed to a maximum-risk facility based on his prior commitment history. The State pointed out that Appellant's new offenses were even more serious than his prior offenses and that the new offenses were committed shortly after his release from a high-risk facility and while he was still on post-commitment probation. Appellant argued that the trial court should follow DJJ's recommendation and commit him to a high-risk facility.
The trial court committed Appellant to a maximum-risk facility. The court explained its decision as follows:
[Appellant], what scares the heck out of me is why you perceive you had a need to have a gun.
* * *
I don't know I've tried through dependency to reach through to you. I've tried through delinquency to reach through to you and I you know, we go back a long ways.
I just don't you know, my job is to try to decide and figure out what's in your best interest, as well as the best interest of society.
I just keep coming back to the conclusion that you pose a severe danger to yourself, and anything less than a maximum risk is going to be sending you the wrong message because if you continue along the path that you're continuing on, you're going to be spending a lifetime behind bars, so. Well, may disagree with me, but I just don't  in analyzing the information and knowing your background and knowing that high risk and moderate risk hasn't worked and that is the only tool left in the arsenal, short of putting you in the adult system, I don't see any rational argument that supports anything less than a maximum risk. (emphasis added).
We review the trial court's disposition order for an abuse of discretion; but, whether the trial court exercised appropriate discretion in imposing a departure disposition depends on 1) whether the trial court employed the proper legal standard as set forth in E.A.R., and 2) whether the court's departure reasons are supported by the evidence. See E.A.R., 4 So.3d at 638-39. Whether the trial court employed the proper legal standard is an issue of law subject to de novo review. See generally Collett v. State, 28 So.3d 224, 226 (Fla. 2d DCA 2010).
In E.A.R., the Florida Supreme Court "announced a new, more rigorous analysis in which a trial court must engage before departing from DJJ's recommendation." M.J.S. v. State, 6 So.3d 1268, 1269 (Fla. 1st DCA 2009). The court explained:
The only rational or logical means through which the juvenile court may provide `reasons' that explain, support, and justify why one restrictiveness level is more appropriate than another  and thereby rationalize a departure disposition  is for the court to:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels including (but not limited to) the type of child that each *176 restrictiveness level is designed to serve, the potential "lengths of stay" associated with each level, and the divergent treatment programs and services available to the juvenile at these levels; and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile-in the least restrictive setting-and maintaining the ability of the State to protect the public from further acts of delinquency.
E.A.R., 4 So.3d at 638. Under this standard, the trial court may not deviate simply because it disagrees with the disposition recommended by DJJ. Id. at 636 (quoting N.B. v. State, 911 So.2d 833, 835-36 (Fla. 1st DCA 2005)). Likewise, the trial court must do more than "parrot" or "regurgitate" the information in the PDR to support a departure disposition, id. at 633, 638; rather, the court must
provide a legally sufficient foundation for `disregarding' the DJJ's professional assessment and PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child's programatic rehabilitative needs along with the risk that the unrehabilitated child poses to the public.
Id. at 638; see also C.A.D. v. State, 18 So.3d 672, 674-75 (Fla. 1st DCA 2009) (affirming departure disposition where the trial court based its disposition on matters not addressed in the PDR).
Here, in committing Appellant to a maximum-risk facility, the trial court focused on the fact that less restrictive options had been unsuccessful in protecting the public from Appellant's continued delinquency. This finding is supported by the evidence, namely the fact that Appellant committed new, more serious offenses within four months after his release from a high-risk facility. The PDR did not address this issue; it simply recounted Appellant's prior offenses and his commitment history. And although the PDR observed that Appellant was not amenable to probation, it offered no explanation why again committing Appellant to a high-risk facility would serve Appellant or protect the public. Thus, the trial court had a legally sufficient basis to deviate from the disposition recommended by DJJ.
Nevertheless, we are compelled by E.A.R. to reverse because, in explaining its rationale for deviating from the disposition recommendation, the trial court failed to articulate its understanding of the respective characteristics of the opposing restrictiveness levels and failed to explain based on these differing characteristics why a maximum-risk facility is better suited to Appellant's rehabilitative needs and the safety of the public.[*] Although "a trial court, working routinely with juveniles, may have insight into the types of *177 programs provided at certain juvenile detention facilities, E.A.R. requires a trial court place that knowledge on record if the judge intends to rely on these types of findings to support deviations." M.H. v. State, 69 So.3d 325, 328 (Fla. 1st DCA 2011). We see nothing in E.A.R. that would relieve the trial court of this obligation where the deviation is based primarily on a need to protect the public, rather than the juvenile's need for a specific program (e.g., drug treatment). In either situation, the findings are necessary for this court to provide meaningful review of the disposition order. See E.A.R., 4 So.3d at 639 (citing Kent v. United States, 383 U.S. 541, 561, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) for the proposition that: "Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions.").
In sum, for the reasons stated above, we reverse the disposition order and remand for resentencing. On remand, the trial court shall either amend the disposition order to include findings required by E.A.R to support the maximum-risk commitment or, if such findings cannot be made, enter a new order committing Appellant to a high-risk facility as recommended by DJJ. See C.C.T. v. State, 53 So.3d 1149 (Fla. 1st DCA 2011); C.M.H. v. State, 25 So.3d 678 (Fla. 1st DCA 2010).
REVERSED and REMANDED with directions.
LEWIS and WETHERELL, JJ., concur; WOLF, J., dissenting.
WOLF, J., Dissenting.
The majority relies on our court's recent decision in M.H. v. State, 69 So.3d 325, (Fla. 1st DCA 2011), to reverse, stating the trial court failed to "place [its] knowledge on record" of the different programs offered by the varying detention levels. I disagree with the application of M.H. and would affirm on the facts of the underlying case. In the alternative, I would certify a question of great public importance as to whether the failure to follow the dictates of E.A.R. v. State, 4 So.3d 614 (Fla.2009), can ever constitute harmless error.
In M.H. this court stated:
As noted in E.A.R., in deviating, a trial court must articulate "an understanding of the respective characteristics of the opposing restrictiveness levels including (but not limited to) . . . the divergent treatment programs and services available to the juvenile at these levels." E.A.R., 4 So.3d at 638 (emphasis added). Here, the trial court implied that the moderate-risk facility would offer the child a "structured" drug program. However, nothing in section 985.03(44)(c), Florida Statutes, states that all moderate-risk facilities have drug treatment programs as suggested by the trial court.
M.H., 69 So.3d 325, 328. As evidenced by the foregoing analysis, the commitment deviation in M.H. was predicated on the trial court's belief that appellant needed a "structured" drug program; however, nothing in the definition of a moderate-risk facility guaranteed the existence of such a program. Id. Unlike M.H., the trial court's main concerns in deviating in the underlying case were the safety of the public, as well as appellant's safety. Specifically, the court noted:
the combination of you had the means to obtain a handgun and you felt the need to obtain a handgun indicates that you have been engaging in very, very, very dangerous conduct . . . my job is to try to decide . . . what's in your best interest, as well as the best interest of society. I just keep coming back to the conclusion that you pose a severe danger to yourself . . . I don't see any rational *178 argument that supports anything less than a maximum risk.
The facts of the underlying case clearly differ from those in M.H., where the juvenile was not found to pose a threat to society or himself. In fact, in M.H., we specifically noted, "The underlying offenses for sale and possession of marijuana are not violent crimes which dictate a heightened need to protect the public, but even if they were, the trial court never stated appellant posed any threat to society." M.H., 69 So.3d 325, 328. Section 985.03(45)(e), Florida Statutes (2010), defines a "Maximum-risk residential" facility as:
Programs or program models at this commitment level include juvenile correctional facilities and juvenile prisons. The programs are long-term residential and do not allow youth to have access to the community. Facilities are maximum-custody, hardware-secure with perimeter security fencing and locking doors. . . . Facilities shall provide 24-hour awake supervision, custody, care, and treatment of residents. The staff at a facility at this commitment level may seclude a child who is a physical threat to himself or herself or others. Mechanical restraint may also be used when necessary. . . . Placement in a program at this level is prompted by a demonstrated need to protect the public.

(Emphasis added).[] Short of reading this definition on record and the definition contained in the administrative code on record, the trial court in the underlying case demonstrated its understanding that the maximum-risk facility was the least restrictive option that would best suit the protection of the public and further prevent appellant from harming himself. Reading the statute and the code into the record would serve no further purpose. As such, I would affirm.
However, I further write to note that both the instant case and M.H. are two recent reversals from this court based on the stringent requirements and bright-line rule outlined by the Florida Supreme Court in E.A.R. v. State, 4 So.3d 614 (Fla. 2009). These cases share the following characteristics:
1. The disposition and commitment level imposed by the trial court were entirely reasonable based on the circumstances of the individual case.
2. The juvenile being sentenced had previously served at the commitment level recommended by Department of Juvenile Justice (DJJ) and within a short period of time, committed the same or a more serious offense.
3. The predisposition report issued by DJJ was inadequate, in one case containing factual inaccuracies and in both cases being totally devoid of any analysis of why the recommended commitment was (1) best suited to meet the rehabilitative needs of the child or (2) best guaranteed *179 to ensure the safety of the general public.
4. Although the court failed specifically to articulate its understanding of the various restrictiveness levels, the disposition imposed was only one level above the one previously imposed, which had failed to deter additional criminal activities by the juvenile.
Where all of the circumstances outlined above exist, the trial court's failure to follow E.A.R. should constitute harmless error. The structure and reasoning of E.A.R., however, appear to contemplate that harmless error would be inapplicable. I believe the Supreme Court should specifically address this issue.
I would, therefore, certify to the Florida Supreme Court the following question as one being of great public importance:
WHETHER A TRIAL COURT'S FAILURE TO FOLLOW THE DICTATES OF E.A.R. V. STATE, 4 So.3d 614 (Fla.2009), CAN EVER CONSTITUTE HARMLESS ERROR?
NOTES
[*] The requisite findings cannot be inferred from the statutory definitions of high-risk and maximum-risk because there appear to be more similarities than differences in the security of these restrictiveness levels. Both levels do not allow the juvenile to have access to the community, both are intended for juveniles who require close supervision because of concerns for public safety, and both types of facilities are "hardware-secure with perimeter fencing and locking doors" and "provide 24-hour awake supervision, custody, care, and treatment of residents." Compare § 984.03(45)(d), Fla. Stat. (definition of "high-risk residential") with § 984.03(45)(e), Fla. Stat. (definition of "maximum-risk residential"). Moreover, there is no indication in the record that a high-risk facility would not adequately protect the public from Appellant (for example, that he has previously escaped from such a facility) or that there is something about a maximum-risk facility that will better serve Appellant's need to change his ways.
[] While the majority states there is no discernable difference between the security provided at high-risk and maximum-risk facilities, there are several key differences. Section 985.03(45) requires that high-risk facilities authorize a 72-hour community leave in certain circumstances, although such is not the case at a maximum-risk facility. The statute also states that placement at the maximum-risk level is prompted by a demonstrated need to protect the public. § 985.03(45), Fla. Stat. No such language is utilized in defining a high-risk facility. Further, pursuant to Florida Administrative Code Rule 63E-7.013 (2011), high-risk facilities are not required to provide (1) a camera surveillance system; (2) a secure sally port; (3) a secure pedestrian gate; or (4) electronic search equipment, while they are required at maximum-risk facilities.